UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON


STATE OF WEST VIRGINIA, <u>ex</u> <u>rel</u>.
PATRICK MORRISEY,
Attorney General,[1]

      Plaintiff,

v.                                Civil Action No. 2:12-3836

CARDINAL HEALTH, INC.,
an Ohio corporation
doing business in
West Virginia,

      Defendant.


<u>MEMORANDUM OPINION AND ORDER</u>


      Pending is the plaintiff's motion to remand, filed
August 29, 2012.


      Following receipt of the reply brief on October 1,
2013, the court provided the parties an opportunity to brief the
court of appeals' recent decision in <u>AU Optronics Corp. v. South
Carolina</u>, 699 F.3d 385 (4th Cir. 2012), which was handed down

---

[1] On February 6, 2013, plaintiff moved to substitute name. This
civil action was instituted by the then-sitting Attorney General
Darrell V. McGraw, Jr.  On January 14, 2013, former Attorney
General McGraw was succeeded by Patrick Morrisey.  It is ORDERED
that the motion to substitute name be, and hereby is, granted.
It is further ORDERED that the caption be, and hereby is,
amended as set forth above pursuant to Federal Rule of Civil
Procedure 25(d).

October 25, 2012.  The final supplemental brief was received on
November 28, 2012.


                              I.


          On June 26, 2012, the Attorney General of the State of
West Virginia instituted this civil action as a part of the
Sovereign's continuing efforts to eradicate an alleged "epidemic
of prescription drug abuse and its costs." (Compl. ¶ 1).  The
complaint provides as follows:

>     Prescription drug abuse costs the State of West
>     Virginia hundreds of millions of dollars annually.
>     Beyond the actual dollars lost, prescription drug
>     abuse devastates families, communities and reduces the
>     State's economic productivity. Prescription drug abuse
>     adversely affects West Virginia's hospitals, schools,
>     courts, social service agencies, jails and prisons as
>     well as diminishing the very quality of life in our
>     cities and towns. Accordingly, the State, by its
>     Attorney General, brings this action against a party
>     whom the Attorney General has identified as having
>     substantially contribut[ed] to and who ha[s]
>     substantially, illicitly and tortiously benefitted
>     financially from the prescription drug abuse problem
>     in West Virginia.

(Id.).  The Attorney General alleges that defendant Cardinal
Health, Inc. ("Cardinal"), has contravened state law in a number
of respects:

>          The Defendant . . . distributes various
>     prescription drugs which are closely identified with
>     the prescription drug abuse problem in West Virginia.
>     This Defendant was on notice of the growing epidemic
>     from the abuse of those prescription drugs which it

supplied and of the quantities and frequency with
which those drugs were distributed to entities in West
Virginia. For reasons which are more specifically set
forth in the following causes of actions this
Defendant is answerable in damages to the State of
West Virginia and is susceptible to such other relief
as is requested.

(Id. ¶ 2).

It is apparent that the Attorney General is seeking a
recovery of damages for the State and not one or more of its
individual citizens.  For example, he details the costs to the
State, both financial and otherwise, that have resulted from the
alleged "prescription drug epidemic:"

Costs to the State of as much as $430 million
annually in the year 2010 with costs projected to be
as much as $695 million annually by 2017;

A per capita death rate from prescription drug
overdose which has at times been either the highest or
the second highest recorded for all states in the
United States. One county, McDowell located in
Southern West Virginia, had a death rate of 34.2 per
100,000 in 2001 and 97.3 in 2008;

Between 2001 and 2008 West Virginia deaths from
overdoses involving prescription drugs quadrupled from
5.1 deaths per 100,000 residents to 21.5;

[T]he demand from the growing problem of addiction and
management of addicted patients will eventually be too
great for the available care provide[r]s unless the
problem is addressed. Many of the addicted patients
have no medical insurance coverage;

(Id. ¶ 3(a) - (d)).

3

The prescription drug problem is emphasized by certain specific examples found in the complaint as follows:

One pharmacy which is located in tiny Kermit, West Virginia in 2006 received 3,194,400 dosage units of hydrocodone which ranked 22nd in the nation among pharmacies with respect to purchases of hydrocodone dosage and 35th nationally if you include mail order pharmacies. The owner who is a licensed pharmacist has testified that the pharmacy filled one prescription per minute. Pharmacy records reveal that the pharmacy regularly paid suppliers hundreds of thousands of dollars, that virtually 90% of the drugs ordered and received . . . are of the kind associated with the prescription drug epidemic. The pharmacy reported revenue of more than $500,000 per month. Recently, an article described Kermit, population 300, as "ground zero" in the prescription drug epidemic;

One Pittsburgh area physician who has entered a guilty plea to a drug law violation allegedly worked in or owned an operation in Southern West Virginia which a federal investigation disclosed netted him personally as much as $20,000 per day in cash deposits made to his personal bank account. That so-called clinic was closed by the government resulting in seizure of hundreds of thousands of dollars in cash from physicians and others who were associated with the clinic;

(Id. ¶ 3(f) - (g)).

The pleading also discusses the burdens that prescription drug abuse visits upon the criminal justice system:

State prosecutors and judges lament that as much as 90% of their case load is regularly made up of matters which are either directly or indirectly related to prescription drug abuse. As one prosecutor recently told a Charleston newspaper "I have sometimes morbidly said I would welcome a cocaine case because at least not as many people are dying from cocaine abuse as they are from prescription drug abuse. I bring this up to point out foremost that we continue to ignore the

4

human cost of substance abuse. Families are destroyed.
People die. People can't get jobs and become homeless.
They don't send their children to school, which
ultimately contributes to truancy, delinquency,
another generation of crime and a host of other
problems. We're at the top of the nation in births of
drug-addicted babies."

(Id. ¶ 3(h)).

The Attorney General alleges that in a pending proceeding in the  District of Columbia, the United States Drug Enforcement Agency ("DEA") has sought the suspension of Cardinal's controlled substance license.  The DEA has apparently asserted in that litigation that Cardinal has failed to implement adequate safeguards to prevent the unlawful diversion of prescription drugs.  Specifically, according to the Attorney General, the DEA has observed that Cardinal has sent "staggeringly high" volumes of pills sent to various dispensers and posed "an imminent danger to public health or safety."  (Id. ¶ 9).

He additionally notes that, on February 2, 2012, the DEA issued an Immediate Suspension Order ("ISO") to Cardinal. Among other matters raised in the District of Columbia proceeding is that Cardinal sent to a town in Florida, the population of which is 53,000, a quantity of 2,050,000 pills, apparently of the type at issue in this litigation.  According

to the Attorney General, "[a]n average pharmacy in the United States dispenses 69,000 oxycodone pills a year." (<u>Id.</u> ¶ 9(b)).

The complaint contains eight counts.  Count One alleges a violation of the West Virginia Uniform Controlled Substances Act ("Controlled Substances Act").  The Attorney General is statutorily authorized to "assist in the enforcement of all provisions of . . . [the Controlled Substances Act] . . . ."  W. Va. Code § 60A-5-501(c).  He explains how he is discharging that obligation here by reference to several steps. First, the Controlled Substances Act directs the State Board of Pharmacy to promulgate rules relating to the distribution of controlled substances.  <u>See</u> W. Va. Code § 60A-3-301.

Second, the Board of Pharmacy drafted those rules. One provision found therein, section 15-2-3.3.1, requires distributors of controlled substances like Cardinal to obtain a permit.  Next, section 15-2-4.4 provides additionally as follows:

> The registrant shall design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant shall inform the Office of the West Virginia Board of Pharmacy of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency.

<u>Id.</u>

6

In exercising his enforcement powers, the Attorney General alleges that Cardinal has "failed to diligently respond to suspicious orders which the Defendant has filled" and has "therefore failed to provide effective controls and procedures to guard against" diversion of controlled substances under the Controlled Substances Act.  (Compl. ¶ 19).  He seeks  injunctive relief to halt recurrent violations of the Controlled Substances Act and to stem the "enormous damages" that have been previously visited upon the State.  (Id. ¶ 22).

Count Two alleges that Cardinal's misfeasance in violating the Controlled Substances Act, among other statutes, has in turn caused liability to attach under the provisions of West Virginia Code section 55-7-9, which states as follows:

> Any person injured by the violation of any statute may recover from the offender such damages as he may sustain by reason of the violation, although a penalty or forfeiture for such violation be thereby imposed, unless the same be expressly mentioned to be in lieu of such damages.

Id.

Count Three alleges a violation of the West Virginia Consumer Credit and Protection Act ("WVCCPA").  The Attorney General asserts that Cardinal engaged in both unfair competition and unfair or deceptive acts or practices.  He asserts that each violation of the Controlled Substances Act and its regulations

constitutes an unfair or deceptive act or practice under the WVCCPA.  He seeks actual damages, statutory damages, attorney fees and costs, and statutory penalties as a result.

Count Four alleges a public nuisance.  Cardinal is accused of distributing the controlled substances, which are subject to abuse and diversion, with the apparent or imputed knowledge that the substances were not being prescribed and consumed for legitimate medical purposes.  The alleged public nuisance is said to have resulted in, inter alia, increased crime and prison populations, diversion of law enforcement and prosecutorial resources, and significant consumption of limited healthcare resources.

Count Five is an unjust enrichment claim.  It asserts that the prescription drug epidemic results in the State expending hundreds of millions of dollars annually on issues relating to the delivery of justice and rehabilitation while at the same time forfeiting expected revenues that would otherwise flow into the treasury but for resultant drug-related workplace accidents and absenteeism.  The Attorney General asserts that Cardinal has correspondingly been unjustly enriched as a result of neglecting their duty to distribute drugs only for proper medical purposes.

Count Six is a negligence claim.  It alleges that Cardinal has failed to exercise reasonable care in the marketing, promotion, and distribution of the relevant controlled substances.  The breach is, again, said to have resulted in the State incurring excessive healthcare, treatment, and rehabilitation costs among other expenses.

Count Seven is a medical monitoring claim.  It alleges that Cardinal's earlier recited tortious acts and omissions have exposed users and abusers of the controlled substances to the dangers of addiction and misuse.  The Attorney General asserts that monitoring, testing, and counseling are a reasonably probable consequence in order to prevent or lessen suffering or death.  He proposes a court-approved medical treatment monitoring program to assure "the relevant product users will . . . receive prompt medical care which could detect and prolong their productive lives, increase prospects for improvement and minimize disability."  (Compl. ¶ 69).  In doing so, he hopes to alleviate some of the burden imposed upon the State's coffers in addressing the same rehabilitative goals.

Count Eight arises under the West Virginia Antitrust Act ("Antitrust Act"), West Virginia Code section 47-18-1 et seq.  The Antitrust Act vests the Attorney General with broad powers.  He is authorized to investigate suspected violations of

the Antitrust Act and to bring actions on behalf of the State to abate, and seek damages for, harm to the sovereign resulting from such violations.  See W. Va. Code § 47-18-6 ("The attorney general shall investigate suspected violations of, and institute such proceedings as are hereinafter provided for violation of the provisions of this article."); id. § 47-18-7; id. § 47-18-8 (providing for civil penalties and the institution of "proceedings to prevent and restrain violations of the" Antitrust Act); id. § 47-18-9 (providing for damage awards to "persons," noting the State and its agencies qualify as "persons", and authorizing the Attorney General to "bring an action on behalf of [the State or its agencies] to recover the damages provided for by" the Antitrust Act or federal law).

The Attorney General alleges that Cardinal has violated the Antitrust Act in various ways, including the unreasonable restraint of commerce.  Specifically, the Attorney General asserts that Cardinal has used unfair and deceptive business practices to attempt to obtain a dominant share in the West Virginia market for controlled substances.  He further alleges a conspiracy between Cardinal and "'pill mill' physicians and pharmacies who prescribe and fill these prescriptions for illegitimate . . . purposes in order to restrain and

monopolize trade in West Virginia for the 'pill mill' market."
(Compl. ¶ 74).

         The relief sought by the Attorney General includes (1)
a temporary and permanent injunction requiring notice to the
Board of Pharmacy respecting suspicious orders for controlled
substances, and (2) a jury trial to assess, <u>inter alia</u>, the
following:

     a. Losses sustained as the proximate result of both
     negligent and conscious violations of the . . .
     Controlled Substances Act and regulations;

     b. Damages sustained as the proximate result of
     nuisances created by the prescription drug abuse
     epidemic;

     c. Damages and losses sustained as the proximate
     result of the Defendant's negligence in marketing,
     promoting and distribution of controlled substances in
     West Virginia;

     d. Disgorgement of unjust enrichment of the Defendant;

     e. Treble damages under the . . . Antitrust Act.

(Compl. WHEREFORE clause).

         On July 30, 2012, Cardinal removed.  The Attorney
General now seeks remand.  He asserts that subject matter
jurisdiction is unavailable under the Class Action Fairness Act
("CAFA").

         Cardinal's notice of removal asserts subject matter
jurisdiction rests on the fact that this case qualifies as both

11

a class action and a mass action under CAFA.  It further
contends that (1) the complaint alleges private claims that the
Attorney General is unauthorized to bring as <u>parens patriae</u>[2], and
(2) the real parties in interest are the affected citizens of
the State who obtained the prescription medications.


                              II.


A.   Governing Standards in General


          "Federal courts are courts of limited jurisdiction.
They possess only that power authorized by Constitution and
statute, which is not to be expanded by judicial decree."
<u>Kokkonen v. Guardian Life Ins. Co. of Am.</u>, 511 U.S. 375, 377
(1994).  Title 28 U.S.C. § 1441(a) governs federal removal
jurisdiction and provides as follows:

---

[2] The term means "parent of the country."  As noted by our court
of appeals in <u>AU Optronics</u>, "A state may sue on behalf of its
citizens as <u>parens patriae</u> when the interests of a group of
citizens are at stake, as long as the state is also pursuing a
quasi-sovereign interest."  <u>AU Optronics</u>, 699 F.3d at 388 n.5
(quoting <u>United States v. Johnson</u>, 114 F.3d 476, 481–82 (4th
Cir. 1997) and <u>In re Edmond</u>, 934 F.2d 1304, 1310 (4th Cir. 1991)
("The state must be more than a nominal party without a real
interest of its own; it must articulate an interest apart from
the interests of ... particular private parties. . . ."
(internal quotation marks omitted)).

> [a]ny civil action brought in a State court of
> which the district courts of the United States have
> original jurisdiction, may be removed by the . . .
> defendants . . . to the district court of the United
> States for the district and division embracing the
> place where such action is pending. . . .

28 U.S.C. § 1441(a).

The burden of establishing removal jurisdiction falls upon the removing party.  Mulcahey v. Colum. Organic Chem. Co., 29 F.3d 148, 151 (4th Cir. 1994).  Our court of appeals has observed time and again that it is obliged to construe removal jurisdiction strictly:

> We have noted our obligation "to construe removal
> jurisdiction strictly because of the 'significant
> federalism concerns' implicated" by it.  Maryland
> Stadium Auth. v. Ellerbe Becket Inc., 407 F.3d 255,
> 260 (4th Cir. 2005) (quoting Mulcahey, 29 F.3d at
> 151). . . .  Consistent with these principles, we have
> recognized that state law complaints usually must stay
> in state court when they assert what appear to be
> state law claims.  See, e.g., Harless v. CSX Hotels,
> Inc., 389 F.3d 444, 450 (4th Cir. 2004); King, 337
> F.3d at 424; Darcangelo v. Verizon Communications,
> Inc., 292 F.3d 181, 186 (4th Cir. 2002); Cook v.
> Georgetown Steel Corp., 770 F.2d 1272, 1274 (4th Cir.
> 1985).

Lontz v. Tharp, 413 F.3d 435, 440 (4th Cir. 2005).  "Any doubts concerning the propriety of removal must be resolved in favor of retained state court jurisdiction."  Marshall v. Manville Sales, Corp., 6 F.3d 229, 232 (4th Cir. 1993).

13

B.   CAFA Governing Standards and Analysis


          CAFA is the source of statutory subject matter
jurisdiction relied upon by Cardinal.  CAFA makes removable both
class actions and collective litigation known as "mass actions."
The removing party is charged with the burden of demonstrating
federal jurisdiction for either a class or mass action under
CAFA.  Strawn v. AT & T Mobility LLC, 530 F.3d 293, 298 (4th
Cir. 2008).  The statute represents a diversity-based
jurisdictional grant in class actions when there is minimal
diversity and the total amount in controversy exceeds
$5,000,000, exclusive of interests and costs.  Ferrell v.
Express Check Advance of SC LLC, 591 F.3d 698, 702 (4th Cir.
2010) (quoting 28 U.S.C. § 1332(d)(2)(A)); see also Palisades
Collections LLC v. Shorts, 552 F.3d 327, 331 (4th Cir. 2008).

          In order to satisfy the minimal diversity requirement,
any one member of the class of plaintiffs must be a citizen of a
state different from any defendant.  AU Optronics, 699 F.3d at
388 (quoting 28 U.S.C. § 1332(d)(2)(A)).  It is equally clear,
however, that the State is not counted in the mix inasmuch as it
is not a citizen for diversity purposes.  Id. at 388 (quoting
Moor v. Alameda County, 411 U.S. 693, 717 (1973) ("There is no

14

question that a State is not a 'citizen' for purposes of the diversity jurisdiction.").

The definition of a CAFA class action is found in 28 U.S.C. § 1332(d)(1)(B): "[A]ny civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action[.]"  28 U.S.C. § 1332(d)(1)(B).

A "mass action," as summarized by the panel in <u>AU Optronics</u>, "must . . . satisfy CAFA's minimal diversity requirement, its numerosity requirement of 100 or more persons, and its amount-in-controversy requirement that all claims, when aggregated, must exceed $5,000,000 and an individual claim must exceed $75,000."  <u>AU Optronics</u>, 699 F.3d at 390.

Moving to the analysis of these rules in light of the allegations, one can rapidly appreciate that the central issue is whether the State is the real party in interest.  If it is, minimal diversity cannot possibly exist.  Cardinal asserts that the real parties in interest on the plaintiff side are in actuality "thousands of West Virginians" rather than the State. (Resp. to Rem. Mot. at 3).  It asserts that the Attorney General is, in essence, pursuing individual claims belonging only to

private parties.  In aid of its contentions, Cardinal points to
"the wisdom" of one fork in a developing split of authority,
known as the "'claim-by-claim' approach," used to assess whether
subject matter jurisdiction exists under CAFA.  (Resp. to Rem.
Mot. at 4).

        The claim-by-claim approach requires the complaint to
be disassembled and a decision made respecting whether the State
is the beneficiary of each basis for relief.  If anyone other
than the State benefits from a particular claim under this
approach, that other party is deemed a plaintiff real party in
interest.  In contrast, the whole-case approach examines the
entirety of the complaint and ascertains what interest the State
possesses in the lawsuit as a whole.

        The law in our circuit has advanced considerably in
the interval between Cardinal's response brief and this writing.
At the time Cardinal penned its submission, the court of appeals
had not yet weighed in on the aforementioned split of authority.
It has done so now, and its  analysis drives the outcome here.

        In AU Optronics, the court of appeals aligned itself
with the two circuits that have chosen the whole-case approach.
The analysis is worth quoting at length:

        South Carolina's claims for relief in these cases are
        each unique to the State and are consistent with its

                              16

role as <u>parens</u> <u>patriae</u>, inasmuch as the State
possesses a quasi-sovereign interest in enforcing --
in state court -- its laws with respect to price-
fixing conspiracies. Furthermore, South Carolina is
the sole named plaintiff in these lawsuits. Indeed,
the provisions of the Antitrust Act and SCUTPA invoked
in the complaints designate the State as the proper
plaintiff.

We are therefore satisfied to resolve these
petitions for permission to appeal by adopting the
whole-case approach and rejecting the claim-by-claim
approach. [T]he nature and effect of these actions
demonstrate that South Carolina is the real party in
interest, a fact that is unencumbered by the
restitution claims. We therefore agree with the Ninth
and Seventh Circuits that a claim for restitution,
when tacked onto other claims being properly pursued
by the State, alters neither the State's quasi-
sovereign interest in enforcing its own laws, nor the
nature and effect of the proceedings. <u>The purpose of
these cases is the protection of the State's citizens
and upholding the integrity of South Carolina law. The
State, in these parens patriae actions, is enforcing
its own statutes in seeking to protect its citizens
against price-fixing conspiracies. That the statutes
authorizing these actions in the name of the State
also permit a court to award restitution to injured
citizens is incidental to the State's overriding
interests and to the substance of these proceedings</u>.
Those citizens are not named plaintiffs here, and they
need not be considered in the diversity analysis of
the State's claims. Thus, CAFA's minimal diversity
requirement is not satisfied in either of these cases,
and the district court properly remanded them to state
court.

<u>AU Optronics</u>, 699 F.3d 385, 394 (4th Cir. 2012)(emphasis added).

One strains to read the complaint herein to reach

individual claims for individual damages.  The pleading is

positively permeated with the notion that Cardinal's monitoring

and control failures significantly contributed to the rampant

abuse of prescription medications in the State.  The complaint recites at multiple points the financial and human toll visited upon the Sovereign as a result of the crisis, affecting even something so basic as law enforcement and the delivery of justice.

In sum, the State wants the prescription drug epidemic halted and compensation for the past harms the alleged plague has visited upon its social welfare, health care, and justice systems.  To the extent individual damages might be theorized, they would play a bit role at most in the litigation.  As in AU Optronics, "[t]he purpose [of the litigation . . . is . . . protection of the State's citizens and upholding the integrity of . . . [State] law.  The State . . . is enforcing its own statutes in seeking to protect its citizens . . . ."  Id. at 394.[3]

It bears emphasizing that this case is not, as Cardinal suggests, one in which the Attorney General "assert[s] a freestanding power to bring claims on behalf of the state's residents."  (Resp. at 10).  A recovery is instead sought for

---

[3] As noted earlier, South Carolina's claims in AU Optronics included the restitution relief sought on behalf of injured South Carolina residents.  Despite that claim, the court of appeals nevertheless viewed the case as a parens patriae action. In the case sub judice, individual, consumer-based relief is not the gist of the action.

the government alone.  Cardinal's assertion that the Attorney
General "can only be acting as a putative private class
representative" is an argument untethered to the operative
pleading in this action, the allegations of which paint an
entirely different picture, namely, one of a state
constitutional officer attempting to secure a single recovery
for a financially overburdened sovereign.

     The court thus concludes that the State is the real
party in interest.  Inasmuch as it is not deemed a citizen for
subject matter jurisdiction purposes, minimal diversity is
absent.  It follows that this case qualifies neither as a class
action nor a mass action under CAFA.[4]  There is thus no basis for
the exercise of subject matter jurisdiction under CAFA.  It is,

---

[4]     Cardinal emphasizes that the claim under the Antitrust Act
bears all the hallmarks of a class action, inasmuch as it
"provides basic procedural protections for absent class members
that are indistinguishable from those in" West Virginia Rule of
Civil Procedure 23.  (Resp. at 3).  The similarity of the Rule
23 device to the Antitrust Act, however, begs the question in
this instance, where the fundamental CAFA requirement of minimal
diversity is absent.
     The same is true of Cardinal's assertion that the Attorney
General is seeking a jury trial when the WVCCPA denies him that
right.  This, Cardinal asserts, reveals the true, individual
nature of the entire action.  That type of confined, claim-by-
claim analysis, however, is inconsistent with the whole-case
approach adopted in AU Optronics.

accordingly, ORDERED that the plaintiff's motion to remand be, and it hereby is granted.[5]

The Clerk is directed to send a copy of this written opinion and order to counsel of record and any unrepresented parties.

DATE:  March 27, 2013

John T. Copenhaver, Jr.
United States District Judge

---

[5]    Although the Attorney General asserts that Cardinal is necessarily making a fraudulent joinder argument as well, the court does not agree.  It is thus unnecessary to address the matter.  It is noted that fraudulent joinder in a setting similar to this is addressed in a memorandum opinion and order entered today in State of West Virginia v. AmerisourceBergen Drug Corporation, No. 2:12-3760 (S.D. W. Va. Mar. 29, 2013).
    The Attorney General also seeks pursuant to 28 U.S.C. § 1447(c) the costs and expenses, including attorney fees, that have resulted from removal.  Cardinal has failed to demonstrate removal jurisdiction.  The assertions offered in support of removal, however, are not objectively unreasonable. See Martin v. Franklin Cap. Corp., 546 U.S. 132, 141 (2005) ("Absent unusual circumstances, courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal.").  The court, accordingly, ORDERS that the request for costs and fees be, and it hereby is, denied.